IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

FILED
RICHARD W. NAGEL
CLERK OF COURT
2021 DEC -3 PM 2: 05
U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

| | |
|---|---|
| STATE OF OHIO | : |
| Plaintiff, | : |
| | : CASE NO. 2:21 CV 5587 |
| vs. | : Judge Sargus |
| MICHAEL JASON MEADE, | : |
| Defendant. | : MAGISTRATE JUDGE VASCURA |

## DEFENDANT'S VERIFIED NOTICE OF REMOVAL OF CRIMINAL ACTION TO FEDERAL COURT

Pursuant to 28 U.S.C. §§ 1442 and 1455, United States Marshal Task Force Officer Deputy Michael Jason Meade, through undersigned counsel, hereby removes this action from the Franklin County Court of Common Pleas to the United States District Court for the Southern District of Ohio, Eastern Division. Copies of all process and pleadings that have been served on Deputy Meade are attached to this notice of removal, as required by § 1455.

**I.     Background.**

The Southern Ohio Fugitive Apprehension Strike Team ("SOFAST") is a law enforcement unit both operated and supervised by the United States Marshals Service. SOFAST operates in the Southern District of Ohio as well as in other districts utilizing the resources of the United States Marshals Service as well as a number of other state and local law enforcement agencies. (Exhibit A). As such, SOFAST is a multi-jurisdictional division within the United States Marshals Service dedicated to apprehending fugitives, typically those alleged to have committed violent crimes and/or felonies. All members are trained by the United States Marshals Service to function as SOFAST.

1

The United States Marshals Service is the lead agency for 56 fugitive task forces located throughout the United States as well as eight Congressionally funded regional fugitive task forces established under the Presidential Threat Protection Act of 2000, P.L. 106-544, 114 STAT 2715. (Exhibit B). These task forces, staffed by federal, state, and local law enforcement agencies, target the most dangerous fugitives. Most of the task forces are full-time endeavors; however, some are formed on an *ad-hoc* basis, in response to specific cases. Funding for these task forces is most often secured through initiatives such as the High Intensity Drug Trafficking Area (HIDTA), Organized Crime Drug Enforcement Task Forces (OCDETF), and Project Safe Neighborhoods (PSN).

Deputy Meade was hired by the Franklin County Sheriff's Office on September 8, 2003, and his regular assignment was with Special Weapons and Tactics (SWAT). However, since May of 2017, Deputy Meade was assigned to SOFAST with regular duty hours from 6:00 a.m. to 2:00 p.m., Monday through Friday. Deputy Meade was expressly detailed to SOFAST unless he was needed by the Franklin County Sheriff's Office SWAT Team for either a barricade or hostage situation.

On December 2, 2021, Deputy Meade was indicted by the Franklin County Grand Jury for two counts of murder and one count of reckless homicide in Case No. 21-CR-5052. A copy of the grand jury indictment is attached hereto as Exhibit C. On December 4, 2020, the day Deputy Meade is alleged to have violated Ohio law, he was detailed to SOFAST and all of his actions referenced in Exhibit C occurred while he was acting in the color of his office as a member of SOFAST.

II. **Grounds For Federal Officer Removal under 28 U.S.C. § 1442.**

Title 28 U.S.C. § 1442, in pertinent part, provides as follows:

(a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

(2) A property holder whose title is derived from any such officer, where such action or prosecution affects the validity of any law of the United States.

(3) Any officer of the courts of the United States, for or relating to any act under color of office or in the performance of his duties;

(4) Any officer of either House of Congress, for or relating to any act in the discharge of his official duty under an order of such House.

\* \* \*

(c) Solely for purposes of determining the propriety of removal under subsection (a), a law enforcement officer, who is the defendant in a criminal prosecution, shall be deemed to have been acting under the color of his office if the officer—

(1) protected an individual in the presence of the officer from a crime of violence;

(2) provided immediate assistance to an individual who suffered, or who was threatened with, bodily harm; or

(3) prevented the escape of any individual who the officer reasonably believed to have committed, or was about to commit, in the presence of the officer, a crime of

3

> violence that resulted in, or was likely to result in, death or serious bodily injury.

"Congress has decided that federal officers, and indeed the Federal Government itself, require the protection of a federal forum." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). As demonstrated above, the federal removal statute permits removal of any "criminal prosecution that is commenced in a State court" against "any officer…of the United States or the agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals." 28 U.S.C. § 1442(a)(1).

This removal statute provides federal officers with a federal forum for the entire trial, including determinations of guilt or innocence as well as the applicability of official immunity. *Wyoming v. Livingston*, 443 F.3d 1211, 1222 (10th Cir. 2006). Thus, the removal statute "grant[s] district court jurisdiction over cases in which a federal officer is a defendant." *Mesa v. California*, 489 U.S. 121, 136 (1989). The requirements of the statute are mandatory. *City of Norfolk, Va. v. McFarland*, 143 F. Supp. 587, 589 (E.D. Va. 1956).

"[T]he removal statute's 'basic' purpose is to protect the Federal Government from the interference with its 'operations' that would ensue were a State able, for example, to 'arres[t]' and bring 'to trial in a State cour[t] for an alleged offense against the law of the State,' 'officers and agents' of the Federal Government 'acting ... within the scope of their authority.'" *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 150 (2007). In *Arizona v. Manypenny*, 451 U.S. 232 (1981), Justice Blackman acknowledged the importance of the removal statute when he noted:

> [H]istorically, removal under § 1442(a)(1) and its predecessor statutes was meant to ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties. The act of removal permits a trial upon the merits of the state-law question free from local interests or prejudice. See *Colorado v.*

*Symes*, 286 U.S. 510, 517-518, 52 S.Ct. 635, 637, 76 L.Ed. 1253 (1932); *Maryland v. Soper*, 270 U.S. 9, 32, 46 S.Ct. 185, 190, 70 L.Ed. 449 (1926). It also enables the defendant to have the validity of his immunity defense adjudicated, in a federal forum. *Willingham v. Morgan*, 395 U.S. 402, 407, 89 S.Ct. 1813, 1816, 23 L.Ed.2d 396 (1969). For these reasons, this Court has held that the right of removal is absolute for conduct performed under color of federal office, and has insisted that the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'

*Manypenny*, 451 U.S. at 241-42.

To qualify for removal, a defendant need only: (1) show that the conduct concerns actions undertaken as a federal officer; (2) show "that the suit is 'for a[n] act under color of office;'" and (3) "raise a colorable federal defense." *Jefferson County, Alabama v. Acker*, 527 U.S. 423, 431 (1999) (quoting 28 U.S.C. § 1442(a)(3)). The notice of removal must simply contain "a short and plain statement of the grounds for removal." 28 U.S.C. § 1455(a).

In considering this issue, a district court should enter an order for summary remand only where it "clearly appears on the face of the notice and any exhibits annexed thereto that removal should not be permitted." 28 U.S.C. § 1455(b)(4). Otherwise, "it shall order an evidentiary hearing to be held promptly and, after such hearing, shall make such disposition of the prosecution as justice shall require." 28 U.S.C. § 1455(b)(5). If removal is permitted, the Court "shall so notify the State court in which prosecution is pending, which shall proceed no further." 28 U.S.C. § 1455(b)(5).

### A.  Deputy Meade's role as a member of SOFAST makes him a Federal Officer.

Deputy Meade has been a full-time member of SOFAST since 2017 and was working in that capacity on December 4, 2020, when Casey Goodson, Jr. was shot. On that day, Deputy Meade's primary responsibilities were to assist other team members in arresting violent fugitives and other felons. As such, on December 4, 2020, Deputy Meade was acting as a federal officer when he shot Casey Goodson, Jr.

5

### B. Deputy Meade was Acting "Under Color of his Office" on December 4, 2020.

The test for whether a federal officer was acting under color of his office is not onerous. The removal statute requires a "causal connection between what the officer has done under asserted official authority and the state prosecution." *Soper*, 270 U.S. at 33. All this requires is that "his acts or his presence at the place in performance of his official duty constitute the basis, though mistaken or false, of the state prosecution." *Id.*

Additionally, the removal statute permits a law enforcement officer to show he acted "under the color of his office" if he acts to protect another person from an act of violence, provides assistance to someone threatened with bodily harm, or acts to prevent the escape of someone he reasonably believed had committed, or was about to commit, a crime of violence causing serious bodily injury. 28 U.S.C. § 1442(c). In determining whether the defendant was acting under "color of his office," a court credits the removing party's theory of the case, rather than deciding the merits of the underlying case for jurisdictional purposes. *Jefferson County*, *Alabama*, 527 U.S. at 432.

### (1) Deputy Meade was Performing his Official Duty.

Shortly before noon, on December 4, 2020, Deputy Meade and other SOFAST members were attempting to execute an outstanding felony drug-trafficking warrant for Kendale Barbour. SOFAST had intelligence that Barbour would be found at his mother's house located at 4071 Estates Place, which is a residential area located in northeast Columbus.

At that time, Deputy Meade was wearing olive-green pants, black boots, a gray and black ball cap, and a black pullover sweater with a neon green strip on the sleeves. Deputy Meade was also wearing a black tactical vest issued to SOFAST members. This vest displayed a patch of

Deputy Meade's badge stating, "United States Marshal." Displayed in large, bold print on the front and back of the vest are the words "U.S. Marshal" and "U.S. Marshals Fugitive Task Force." On that day, Deputy Meade didn't have a partner, but he was driving an unmarked gray F-150 pickup truck issued by the United States Marshals Service.

On December 4, 2020, approximately twelve SOFAST members assembled to execute Barbour's arrest warrant. SOFAST members approached 4071 Estates Place and encountered Kendale Barbour's mother, who informed them her son was not home. A subsequent consent search verified Barbour's mother's statement.

After the search, Deputy Meade's direct supervisor and team leader, Deputy United States Marshal David Youngless, directed SOFAST members to return to their office in downtown Columbus. As SOFAST members left the front porch of 4071 Estates Place, Deputy Meade briefly spoke with SOFAST members Ryan Rosser and Joseph Yourkiewicz before returning to his pickup truck to return to the office. Deputy Meade then secured his tactical vest, pistol belt, and handgun inside a vault in his truck's bed, while his .556 M-4 rifle was placed in the backseat of the truck.

Deputy Meade left 4071 Estates Place by traveling northbound and was followed by SOFAST members Rosser and Yourkiewicz. Deputy Meade turned left onto Ferris Road, now traveling westbound and stopped at the traffic light at Ferris and Karl Roads.

While Deputy Meade was stopped at this intersection, he saw a dark colored hatchback driving southbound on Karl Road. This vehicle was in the left lane and signaled it was turning left to travel eastbound on Ferris Road. The hatchback stopped briefly to allow northbound traffic to clear at which time Deputy Meade saw the driver of the car, later identified as Casey Goodson, Jr., with a black handgun with an extended magazine in his right hand.

Casey Goodson, Jr. had the gun raised above the steering wheel held sideways and aimed toward the windshield. Deputy Meade observed Casey Goodson, Jr. repeatedly straightening his arm forward in a manner such that he was pumping the gun toward the windshield and then pulling it back. It also appeared Casey Goodson, Jr. was yelling as he pumped the gun, but Deputy Meade was unable to hear what was being said.

Deputy Meade observed Casey Goodson, Jr. aim the gun at a driver of a car traveling northbound on Karl Road as it approached the intersection. Casey Goodson, Jr. tracked the other driver with his gun as the car travelled northbound, but Deputy Meade couldn't tell if the driver even knew a gun was pointed at him.

After witnessing Casey Goodson, Jr. track the driver with his handgun, Deputy Meade accessed his radio, on a United States Marshal frequency, and notified SOFAST team members of his observations. Another SOFAST team member, believed to be Deputy Youngless, asked for and received confirmation of Deputy Meade's location.

Casey Goodson, Jr. turned left onto Ferris Road, now traveling eastbound, and as he passed Deputy Meade's vehicle, Goodson pointed his gun directly at Deputy Meade causing him to duck and reach for his pistol. However, Deputy Meade's pistol was stowed in the vault in the bed of his truck. Deputy Meade then aired on the radio, again on a United States Marshal frequency, that Casey Goodson, Jr. was still pointing a gun at motorists, and he also notified SOFAST member Rosser that Goodson was passing by his vehicle. Deputy Meade notified SOFAST members that Goodson was driving toward Estates Place, where SOFAST attempted to locate Kendale Barbour; however, Deputy Meade also notified SOFAST members the person waiving the gun wasn't Barbour.

8

Deputy Meade made a U-turn and began following Goodson's vehicle but lost sight of him on Ferris Road. Deputy Meade then turned onto Estates Place and located Goodson's vehicle parked at the end of the street, well past 4071 Estates Place. Deputy Meade parked his vehicle, alighted, and donned his tactical vest with the previously mentioned United States Marshal markings. Around that time, SOFAST members Rosser and Yourkiewicz arrived, and Deputy Meade notified them the driver who was pointing the pistol was in a car at the end of the street.

Deputy Meade observed Goodson alight from his car, still holding the black pistol in his right hand, and Deputy Meade directed Rosser's and Yourkiewicz's attention to Goodson's location and informed them he still had a gun in his right hand. Casey Goodson, Jr. looked directly at Deputy Meade and started moving quickly toward 3996 Estates Place and had, what appeared to be, a plastic bag in his left hand.

After his tactical vest was securely on, Deputy Meade grabbed his rifle from the backseat of his truck and shut the truck's door. By this time, however, Goodson maneuvered behind the southwest corner of his house and out of Deputy Meade's view, in what appeared to be, an effort to evade Deputy Meade. Deputy Meade then got into his truck and drove to the end of the street where he saw Goodson approaching a side door of 3996 Estates Place, inside an open fence gate near the southeast corner of the house.

Deputy Meade quickly stopped the truck, alighted, trained his rifle on Goodson, and yelled repeatedly "U.S. Marshals," "It's the police," and "Show me your hands." However, Casey Goodson, Jr. ignored these commands. Deputy Meade kept his rifle trained on Goodson and moved toward him at which time he saw Goodson trying to open the inside door to 3996 Estates Place. At this time, Deputy Meade couldn't see Goodson's hands as his back was facing Deputy Meade

and the storm door was resting against his body. Deputy Meade kept yelling the same commands which Goodson continued to ignore.

Deputy Meade advanced toward Goodson and was around the location of the gate, roughly 10-15 feet from Goodson, when Goodson opened the inside door. Casey Goodson, Jr. began to step forward but stopped at the threshold, which made Deputy Meade believe he was going to comply with his command to "show me your hands." Deputy Meade observed Goodson sigh, droop his shoulders, and slump his body which also made Deputy Meade believe Goodson was going to comply.

However, Goodson then turned and looked in Deputy Meade's direction while lifting his right arm towards Deputy Meade thereby raising and leveling his gun's barrel in Deputy Meade's direction. Deputy Meade screamed to drop the gun, stepped to his left, flipped on his rifle's firing mode, and shot Goodson. Deputy Meade fired his weapon five or six times in the span of one second and Goodson fell to the ground. Underneath Goodson's torso was the black semi-automatic handgun Deputy Meade observed Goodson carrying in his right hand.

Based on Casey Goodson, Jr.'s actions of pointing his weapon at both Deputy Meade as well as the other driver, Deputy Meade intended to detain him for a field interview and/or place him under arrest for improper handling of a firearm in a motor vehicle and aggravated menacing. As a SOFAST member, Deputy Meade believed he was duty bound to investigate and/or arrest Goodson given the conduct he observed. No other SOFAST member dissuaded Deputy Meade from pursing Goodson after he aired his observations on the U.S. Marshal radio frequency. Deputy Meade also feared the safety of the occupants inside 3996 Estates Place was in jeopardy given Casey Goodson, Jr's actions. Finally, Deputy Meade was in fear for his life as he had no cover or concealment when he fired his weapon.

### C. Deputy Meade has a Colorable Federal Defense of Immunity Under the Supremacy Clause of the United States Constitution.

The final requirement for removal is the averment of a colorable federal defense. *Mesa*, 489 U.S. at 129. "Supremacy Clause immunity governs the extent to which states may impose civil or criminal liability on federal officials for alleged violations of state law committed in the course of their federal duties." *Livingston*, 443 F.3d at 1213. This immunity is rooted in the Supremacy Clause of the United States Constitution, which provides:

> [T]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. Art. VI, cl. 2.

This clause is designed to ensure that states do not "retard, impede, burden, or in any manner control" the execution of federal law. *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 436 (1819). The Supreme Court's leading case on Supremacy Clause immunity is *In re Neagle,* 135 U.S. 1 (1890), in which the Court held that a deputy marshal was immune from state prosecution for murder when he killed California Chief Justice David Terry, whom he suspected was about to stab Supreme Court Justice Stephen Field.

While riding the circuit, Justice Field presided over a civil case where David Terry and his wife were litigants. *Id*. at 44-5. During the proceedings, both Terrys erupted into violence, assaulted a marshal, and attempted to brandish weapons. *Id*. 45-6. Because of this outburst, Justice Field found the Terrys in contempt and sentenced them to prison. *Id*. at 45.

Subsequently, the Terrys issued several threats against Justice Field and Deputy United States Marshal David Neagle was assigned to protect Field when he returned to his circuit duty in California about a year later. *Id*. at 51-2. Justice Field was traveling by train from Los Angeles to

San Francisco when the Terrys boarded the train in Fresno. Justice Field was eating in the dining car when he was approached by the Terrys. Upon seeing Justice Field, Mrs. Terry left the dining car to obtain a revolver while her husband began assaulting Justice Field with his fists. *Id*. at 52-3.

Deputy Neagle commanded Terry to stop and Terry responded by reaching into his clothing as if to pull out a weapon at which time Neagle shot him dead. *Id*. at 53. It was later determined that David Terry had no weapons on his person and Neagle was charged with murder, in violation of California law. Neagle's case was removed to federal court and the Supreme Court ruled that he was entitled to habeas relief because he was acting under authority of the law of the United States and was not "liable to answer in the courts of California on account of his part in that transaction." *Id*. at 76.

The Court concluded that Neagle's belief that Justice Field's life was in danger was "well-founded" and his actions were justified. *Id*. Accordingly, it was necessary and proper for Neagle to use lethal force against Mr. Terry. *Id*.

Under the Supremacy Clause of the United States Constitution, federal officers are immune from state prosecution if: "(1) the federal agent was performing an act which he was authorized to do by the law of the United States and (2) in performing that authorized act, the federal agent did no more than what was necessary and proper for him to do." *Commonwealth of Kentucky v. Long*, 837 F.2d 727, 744 (6th Cir. 1988). Once a defendant raises the defense of Supremacy Clause immunity, the burden shifts to the state to supply sufficient evidence to raise a "*genuine* factual issue" that is supported by more than mere allegations. *Id*. at 752.

For an act to be "necessary and proper," "two conditions must be satisfied: (1) the actor must subjectively believe that his action is justified; and (2) that belief must be objectively

reasonable." *Id.* at 745., *accord, New York v. Tanella*, 374 F.3d 141, 147 (2d. Cir. 2004). Courts must "evaluate the circumstances as they appear to [the] federal officer [] at the time of the act in question, rather than the more subtle and detailed facts later presented to a court." *Livingston*, 443 F.3d at 1229. Importantly, the removal statute "is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Mesa*, 489 U.S. at 133. "The officer need not win his case before he can have it removed." *Willingham*, 395 U.S. at 407.

In pursuing and attempting to interview and/or apprehend Casey Goodson, Jr. and while attempting to protect himself and others from the threat of serious bodily harm, Deputy Meade was clearly performing acts he was authorized to perform as a SOFAST member. Moreover, Deputy Meade reasonably believed his actions were justified in carrying out his federal duties and under the facts of this case, Deputy Meade's subjective belief was objectively reasonable. As such, Deputy Meade has asserted a colorable federal defense as he is immune from prosecution pursuant to Supremacy Clause immunity and has fulfilled the third and final requirement for removal, as required by § 28 U.S.C 1442(a).

### III. CONCLUSION.

For the foregoing reasons, Deputy Meade respectfully requests this criminal action be, and is hereby, removed to the United States District Court for the Southern District of Ohio, Eastern Division, that this Court enter such other and further orders as may be necessary to accomplish the requested removal and promote the ends of justice, and that the criminal action now pending in state court "proceed no further," within the meaning of 28 U.S.C. §1455(b)(5).

## IV. VERIFICATION.

I have reviewed this verified notice of removal and pursuant to 28 U.S.C. 1446, I hereby attest to the accuracy of the contents of this notice.

12/2/21
Date

Michael Jason Meade

STATE OF OHIO         :
                      : SS
COUNTY OF FRANKLIN    :

BE IT REMEMBERED, that on this 2nd day of December, 2021 before me, a Notary Public in and for said County, personally came Michael Jason Meade, who attested to the accuracy of the contents of this document and also acknowledged the signing of the foregoing instrument to be his voluntary act and deed, for the uses and purposes therein mentioned.

Sworn to before me and subscribed in my presence this 2nd day of December, 2021.

Notary Public

MARK C. COLLINS, ATTORNEY AT LAW
NOTARY PUBLIC, STATE OF OHIO
My commission has no expiration date.
Section 147.03 R.C.

Respectfully submitted,

/s/ Mark C. Collins

Mark C. Collins
150 E. Mound Street, Suite 308
Columbus, OH 43215
(614) 443-3100
mark@markcollinslaw.com

/s/ Steven S. Nolder

Steven S. Nolder (0037795)
65 East State Street, Suite 200
Columbus, Ohio 43215
(614) 221-9790
snolder9@gmail.com
Attorneys for Michael Jason Meade

14

**CERTIFICATE OF SERVICE**

I hereby certify that on December 3, 2021, I filed the foregoing Notice of Removal at the Clerk of Courts for the United States District Court for the Southern District of Ohio and served Duly Appointed Special Counsel to the Prosecuting Attorney of Franklin County, Ohio, Timothy Merkle and Gary Shroyer, at their email accounts: htm@ejhlaw.com and gary@shroyerlaw.com.

/s/ Steven S. Nolder
Steven S. Nolder (0037795)
Attorney for Michael Jason Meade