## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff, | : | |
| | | CASE NO. 2:21-CV-5587 |
| vs. | : | |
| | | JUDGE SARGUS |
| MICHAEL JASON MEADE, | : | MAGISTRATE JUDGE VASCURA |
| Defendant. | : | |

**DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT
OF HIS RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY REMAND**

On December 3, 2021, Defendant Michael Jason Meade filed a verified notice of removal (R. #1, Notice of Removal) and four days later, the State of Ohio filed a motion for summary remand (R. #5, Motion for Summary Remand). On December 15, 2021, Meade filed his response in opposition. (R. #7, Response in Opposition).

This case is scheduled for an evidentiary hearing on February 11, 2022, where evidence will be adduced on two issues: (1) whether Meade was a "federal officer" on December 4, 2020? and (2) whether Meade was acting under the color of his office when Casey Goodson was shot? (R. #9, Order).

In his response in opposition, Meade maintained he was a federal officer when he observed Casey Goodson violating state law on December 4th. Moreover, as a federal officer, Meade contended that both statutory and extant case law authorized him to investigate and arrest Mr. Goodson for violating state law. (R. #7, Response in Opposition, PAGE ID #43-50).

The State opposed these positions contending Meade wasn't a federal officer when he observed Goodson as "his activities as a SOFAST member had concluded for the day and members

1

of the task force were leaving the field." (R. #5, Motion for Summary Remand, PAGE ID #38). The facts adduced at the upcoming evidentiary hearing will demonstrate the fallacy of this argument.

The State's position that Meade wasn't acting under color of law calls for a more layered response, as evidenced by his response in opposition. (R. #7, Response in Opposition, PAGE ID #43-50). The State's contention is rooted in its belief that at most, Meade observed Goodson committing a state crime. Moreover, it also contends the Memorandum of Understanding (MOU) between the United States Marshal Service (USMS) and the Franklin County Sheriff only empowered Meade to arrest a "fugitive," which Goodson was clearly not. (R. #5, Motion for Summary Remand, PAGE ID #37-8).

There's no question the face of the MOU expressly imbues SOFAST members with the authority to arrest fugitives. However, the limited jurisprudence on this question and even a pertinent 2018 USMS Policy Directive teaches that if in the process of searching for a fugitive a state felony is observed, SOFAST members are permitted to investigate and make an arrest for that crime as well.

When SOFAST members participate in a task force investigation of state law fugitives pursuant to the Attorney General's direction under 28 U.S.C. § 566(e)(1)(B), they are "executing the laws of the United States," within Ohio, as envisioned by 28 U.S.C. § 564. Importantly, in the seminal case, *In re Neagle*, 135 U.S. 1 (1890), the Supreme Court ruled that "any duty of the marshal to be derived from the general scope of his duties under the laws of the United States, is 'a law' within the meaning of [the Supremacy Clause]." *Id*. at 59.

Consequently, while in the status of attempting to locate fugitives, a power SOFAST members are clearly given under federal law, § 564 also provides them with derivative powers

reserved for the sheriff in Ohio. Consequently, in this context, SOFAST members are authorized by statute to make arrests for state law violations. This point was illustrated in two cases, one cited in Meade's response in opposition and one which was not.

First, the case not cited in Meade's response. In *United States v. Red Feather*, 392 F. Supp. 916 (D.S.D. 1975), the district court held that U.S. marshals exercising federal authority at the Wounded Knee uprising had full authority of state sheriffs under South Dakota law to "keep and preserve the peace" and to "pursue and apprehend **all** felons." *Id*. at 919. (Emphasis supplied). As noted in Meade's response in opposition, Judge Lambros, in *United States v. Laub Baking Co., et. al*, 283 F. Supp. 217, 220 (N.D. OH. 1968) also recognized the Marshal's derivative Ohio sheriff powers provided by federal law. (R. #7, Response in Opposition, PAGE ID #45-46).

The State of Ohio's reliance only on the MOU's verbiage to divine whether Meade was acting under color of law on December 4, 2020, is problematic for two additional reasons. The first is the language in the MOU isn't the only source of authority for SOFAST members. That's been illustrated by § 564. Undersigned counsel has found one case addressing this precise issue and it was decided by the Fifth Circuit Court of Appeals, *Texas v. Kleinert*, 855 F.3d 305 (5th Cir. 2017).

Charles Kleinert was an Austin Police Department detective who was specially deputized to work fulltime on a FBI violent crimes task force investigating bank robberies. *Id*. at 309. Kleinert reported to work at the FBI Field Office, got a security clearance, was supervised by a FBI agent, and used FBI issued equipment. *Id*.

After a bank was robbed by a white male, it was closed, and Kleinert was on scene interviewing bank employees. *Id*. During these interviews, a black man, Larry Jackson, came to the bank's front door, tried to open it, but was turned away because it was locked. *Id*. One of the

3

bank employees went to the front door and engaged Jackson who stated his purpose for being at the bank, which the employee knew was false. *Id*. Suspecting that Jackson was attempting to commit bank fraud, a bank employee asked Kleinert to speak to Jackson. *Id*.

After Kleinert approached Jackson and identified himself, Jackson took off running and Kleinert pursued. *Id*. at 310. After Kleinert caught Jackson, there was a physical confrontation during which Jackson was shot and killed. *Id*. Kleinert was charged with Jackson's homicide in state court, and he removed the case to federal court. *Id*. at 310-11.

The MOU relevant to Kleinert's case limited the task force to investigating "violent" crimes. *Id*. at 315. Because Jackson's conduct was tantamount to committing bank fraud, Texas viewed his conduct as non-violent. *Id*. Consequently, Texas maintained that Kleinert acted outside the scope of the MOU and thus, outside of his federal office by attempting to arrest Jackson for a non-violent offense. *Id*.

The Fifth Circuit rejected Texas' argument finding the text of the MOU doesn't "limit the types of crimes that task force officers may investigate." *Id*. Instead, the court credited the testimony that a TFO with reason to believe a person committing bank fraud, a nonviolent offense not mentioned in the MOU, has a duty to investigate and arrest. Citing with approval to *In re Neagle*, the court of appeals found that "officers act within their federal authority so long as they act according to 'any obligation fairly and properly inferable from [the Constitution], or any duty of the [officer] to be derived from the general scope of his duties under the laws of the United States.'" *Id*.

In his response in opposition, Meade cited to *United States v. Jenkins*, 67 F.3d 297, 1995 WL 579308 (TABLE) (4th Cir. 1995) as support for his contention that Deputy United States Marshals are operating within the color of their office by effecting an arrest for a non-violent state

4

crime.  Additionally, *United States v. Colbert*, 70 F.3d 1263, 1995 WL 703546 (TABLE) (4th Cir. 1995) was cited to demonstrate Special Deputy United States Marshals, while searching for a fugitive, were acting within the scope of their duties by attempting to detain and arrest a person they believed was actively violating state law.

Finally, Meade referenced the USMS policy about deputies involving themselves in state law enforcement matters by citing *United States v. Hoy,* 137 F.3d 726 (2d Cir. 1998).  At Hoy's trial, Deputy Schlagel testified about this policy, as it existed in 1995, and that testimony is found in Meade's response.  (R. #7, Response in Opposition, PAGE ID #49-50).  However, a copy of the written USMS Policy Directive on this issue eluded undersigned counsel, until recently.

On June 28, 2018, more than a decade after the MOU was executed by the Franklin County Sheriff and the USMS, the USMS issued an updated Policy Directive on "Investigative Operations" addressing the authority to make arrests for state crimes witnessed by both deputies and task force members.  (Exhibit A, pp. 3-4).  The purpose of this updated Policy Directive was to "set out U.S. Marshals Service (USMS) policy relating to Deputy U.S. Marshals who make arrests for state law violations …committed in their presence."  Exhibit A, p. 3.  The express authority for "**USMS task force members** to take action relating to state crimes is derived from the Attorney General's National Anti-Violent Crime Initiative." (Emphasis Supplied). Exhibit A, pp. 3-4.

The updated USMS policy directive provides as follows:

> **(C) Policy:**  If a deputy U.S. Marshal, who is in possession of their badge, credentials, and authorized weapon, witnesses a violation of state law which could result in death or physical injury to a person, the Deputy is authorized and has the discretion to take reasonable action as a law enforcement officer to prevent the crime or apprehend the violator.

5

>    (1)    **This applies to Deputy U.S. Marshals who are on or off duty**.
>
>    (2)    This applies only to situations where there is an immediate need to arrest the person to prevent his/her escape, to prevent additional violations from occurring or to prevent physical injury or death.
>
>    (3)    This does not authorize Deputy U.S. Marshals to take action relating to traffic violations (including DUI), misdemeanors, other minor offenses, or felonies (such as embezzlement) or domestic disputes which clearly will not result in death or serious physical injury to a person.
>
>    (4)    In some states, legislative authority exists for a deputy to intervene in certain types of state crimes as a peace officer rather than as a private citizen.  Of greater significance in terms of potential personal liability, however, is the issue of whether intervention by a deputy in a particular non-Federal crime falls within the scope of employment.  While a determination as to legal representation will depend on the facts and circumstances of each case, the USMS will recommend that the Department of Justice provide representation to deputies who reasonably intervene in state law violations.
>
>    **(D) Procedures:    When initiating a state law arrest as authorized, an announcement of "Police, U.S. Marshal" will be made followed by other necessary verbal commands.  The arresting deputy will properly identify themselves by exhibiting a badge or credentials and stating the purpose for the arrest.**

(Exhibit A, p. 4) (Emphasis supplied).

The facts Michael Jason Meade averred were true in his notice of removal set forth the reasons he believed Casey Goodson violated Ohio law. (R. #1, Notice of Removal, PAGE ID #7-10).  The facts contained in the verified notice of removal were taken from a statement of facts Meade provided to investigators within a month of the incident and which is annexed hereto as Exhibit B.

All weapons offenses, especially those committed in a moving vehicle, are serious offenses, present a clear and present danger to the public, and merit law enforcement investigation and arrest if probable cause is developed.  Thus, under the 2018 USMS Policy Directive, as a

Special Deputy United States Marshal and Task Force Officer, Meade was authorized to both investigate and arrest Casey Goodson for the conduct he observed. Pursuant to the 2018 USMS Policy Directive, this authority existed regardless of whether Meade was "on or off duty." Moreover, by wearing a vest identifying himself as "U.S. Marshal" as well as announcing his authority as "Police" and "United States Marshal" when he finally caught up to Goodson, Meade complied with the procedures found in the USMS Policy directive.

Consequently, under the relevant statutes and cases cited in Meade's response in opposition as well as the 2018 USMS Policy Directive attached hereto as Exhibit A, he was acting under color of his office when he encountered Casey Goodson on December 4, 2020.

The second problem created by the State of Ohio's reliance only on the verbiage in the MOU is if SOFAST members' authority is confined to only arresting fugitives, it creates a textbook separation of powers problem. By enacting § 564, Congress arrived at the judgment that Marshals, Deputy Marshals, and "such other officials of the Service as may be designated by the Director," have the derivative authority of the sheriff while they are discharging their federal office. In Ohio, as discussed, that's a broad grant of authority as the sheriff has a duty to "preserve the public peace." R.C. 311.07. This broad grant of authority allows sheriffs to arrest "felons." *Id*.

While the text of the Constitution does not expressly refer to the doctrine of separation of powers, it divides governmental power among three branches by vesting the legislative power of the federal government in Congress; the executive power in the President; and the judicial power in the Supreme Court and any lower courts created by Congress. Of the three branches, Congress is the most responsive to the will of the people. And the Founders designed it that way for a reason: Congress wields the formidable power of "prescribing the rules by which the duties and rights of

7

every citizen are to be regulated." The Federalist No. 78, at 465 (Alexander Hamilton). If legislators misused this power, the people could respond, and respond swiftly.

To apply the verbiage in the MOU literally, as suggested by the State of Ohio, two executive branch actors, the Franklin County Sheriff and the United States Marshal for the Southern District of Ohio, would be restricting the authority of SOFAST by taking away the express authority that Congress had given it in § 564. This, the separation of powers will not tolerate.

In conclusion, when Michael Jason Meade witnessed Casey Goodson violating Ohio law, he was acting as a federal officer and under the color of his office as a deputized Special Deputy United States Marshal. The 2018 USMS Policy Directive, § 564, and the applicable jurisprudence show Meade had the authority to step into the sheriff's shoes, investigate, and even arrest Goodson for the crimes he observed. Consequently, by pursuing Goodson, Meade wasn't on a personal frolic; instead, he was acting within the scope of what he was employed to do.

Respectfully submitted,

/s/ Mark C. Collins

_____
Mark C. Collins (0061207)
Mark Collins Co., LPA
150 E. Mound Street, Suite 308
Columbus, OH 43215
(614) 443-3100
mark@markcollinslaw.com

/s/ Kaitlyn C. Stephens

_____
Kaitlyn C. Stephens (0095589)
Mark Collins Co., LPA
150 E. Mound Street, Suite 308
Columbus, OH 43215
(614) 443-3100
kaitlyn@mcollinslaw.com

/s/ Steven S. Nolder
_____
Steven S. Nolder (0037795)
65 East State Street, Suite 200
Columbus, Ohio 43215
(614) 221-9790
snolder9@gmail.com
Attorneys for Michael Jason Meade

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 21, 2022, I filed the foregoing supplemental notice on the ECF electronic filing system and thereby served all counsel of record.

/s/ Steven S. Nolder
Steven S. Nolder (0037795)
Attorney for Michael Jason Meade