Exhibit B

## STATEMENT OF DEPUTY MICHAEL JASON MEADE, BADGE NO. 1027

This statement is regarding my involvement in an incident that occurred on Friday, December 4, 2020 between approximately 12:10 – 12:20 p.m. I am voluntarily making this statement as part of the investigation concerning this matter.

My date of hire with the Franklin County Sheriff's Office ("FCSO") is September 8, 2003. My regular assignment is Special Weapons and Tactics ("SWAT"), A-Company. My regular duty hours in that assignment are 6:00 a.m. until 2:00 p.m., with Saturday and Sunday off. Since May of 2017, I have also been assigned to the United States Marshal's Service Southern Ohio Fugitive Apprehension Strike Team ("SOFAST"); however, I have the same duty hours and days off as my regular SWAT assignment. SOFAST is a multi-jurisdictional division within the U.S. Marshal's Service dedicated to apprehending fugitives, typically those alleged to have committed violent crimes and/or felonies. I work on the SOFAST task force unless I am needed by the FCSO SWAT Team for a barricade and/or hostage situation or for scheduled training.

Prior to joining the FCSO, I enlisted in the United States Marine Corps in August of 2000. As part of my enlistment, I received extensive training in marksmanship, infantry school, and machine gunner school. I was deployed to Iraq in 2005 (concurrent with my employment with the FCSO). While serving in Iraq, I completed eleven combat operations. I continued training once I returned to the United States until my enlistment ended in 2008.

At the time of this incident, I was wearing olive-green pants, black boots, a gray and black ball cap, and a black pullover sweater with a neon green stripe on the sleeves. I was also wearing a black tactical vest. The front of the vest displays a patch of my badge stating "United

Exhibit B

States Marshal." Displayed in large, bold print on the front and back of the vest are the words "U.S. MARSHAL" and "U.S. MARSHALS FUGITIVE TASK FORCE," respectively.

I was carrying my FCSO-issued select-fire Daniel Defense .556 M4 rifle, equipped with an Aimpoint red dot sight. The rifle was loaded with FCSO-issued Hornady T.A.P. ammunition. I was range-qualified with my rifle. I was not carrying a backup firearm at the time of the incident. I did not have a partner. I was driving my Marshal-issued unmarked magnetic gray F-150 pickup truck.

I have good hearing and do not need hearing aids. I received LASIK eye-surgery a few years ago, so I have excellent vision and do not need prescription corrective lenses. I was not taking any prescription or over-the-counter medications that could impair the performance of my duties. I did not consume alcohol or work any special duty in the 24 hours before my shift began. I arrived at my shift well-rested and in good health.

Shortly before noon on December 4, 2020, I and several SOFAST members attempted to execute a routine arrest warrant. Since joining SOFAST in 2017, I have helped execute hundreds of arrest warrants. In most cases, the suspect is not found in the first location we search. Often several locations are searched over time until we apprehend the suspect.

On this day, our team had received information that the fugitive, Kendale Barbour, might be at his mother's house at 4071 Estates Place, located in a residential neighborhood in northeast Columbus. Mr. Barbour was wanted on a felony drug-trafficking warrant. About twelve SOFAST members, including Columbus Division of Police ("CPD") Officer Ryan Rosser and Joseph Yourkiewicz, a probation officer with the Adult Parole Authority ("APA"), plus several members of the FCSO SWAT team assisted in executing the warrant. Mr. Barbour's mother, who was quite cordial and cooperative, told us her son was not in the house. She also allowed us

to search the residence. I cleared and searched the house with other officers, but we did not find Mr. Barbour.

After the search was complete, Deputy U.S. Marshal Dave Youngless (who is my direct supervisor and SOFAST Team Leader) told SOFAST members to return to our office in downtown Columbus. As officers returned to headquarters, I spoke with Officers Rosser and Yourkiewicz outside the residence for several minutes. Once most officers had left, I loaded my tactical vest, pistol belt and handgun into a vault inside the truck bed of my F-150 and placed my rifle in the backseat.

I drove from the residence northbound on Estates Place, followed by Officers Rosser and Yourkiewicz in an unmarked black Dodge Ram. I turned left (west) onto Ferris Road, drove about 100 yards then stopped at a red light at the intersection of Ferris Road and Karl Road. The first in a line of cars, I saw Officer Rosser's truck one or two vehicles behind mine at the light. I looked right (north) to ensure the road was clear and saw a dark colored hatchback driving southbound on Karl Rd. That vehicle approached the intersection in the left-hand lane, signaling that he was turning left (east) onto Ferris Road.

The vehicle stopped to wait for the northbound traffic to clear, and as it did so, I saw the driver had a black handgun with an extended magazine in his right hand. He had the gun raised above the steering wheel held sideways (i.e., palm down) aimed toward the windshield. He was repeatedly straightening his arm forward such that he was pumping the gun toward the windshield then pulling it back. He also appeared to be yelling as he pumped the gun (but I could not tell what, if anything, he was saying). A car travelling northbound on Karl Road approached the intersection, and the individual aimed the gun at the driver of the car. The individual tracked the driver with his gun as the car travelled north, but I did not see whether the driver reacted to

3

the gun. I quickly grabbed my radio and aired (words to the effect), "Hey guys, if you're still on here, we got a guy waving a gun here at the intersection at Karl Road." An officer (who I believed was Marshal Youngless) radioed in response and asked for my location, which I gave.

At that time, the individual turned left (east) onto Ferris Road, and as he did so, he pointed his gun directly at me. I immediately ducked and reached for my pistol. I typically keep my handgun inside the pocket of the driver's side door, but I realized I stored it in the vault. I recall airing, "He's pointing a gun at everyone out here. He's coming past you right now Ryan [Rosser]. He's driving toward the target street (i.e., Estates Place)." An officer, who I again believed was Marshal Youngless, responded, "Is this our guy (i.e., Mr. Barbour)?" I replied that it "was not our guy" and was "totally unrelated."

As I aired that information, I made a U-turn and drove east on Ferris Road. By the time I turned around, however, the suspect had disappeared. Believing he may have turned off Ferris Road, I turned onto Estates Place and saw the suspect's vehicle parked in front of a house near the end of the street, on the eastern side of the road. That house was several houses south of 4071 Estates Place, where we executed the arrest warrant. I aired that the suspect was stopped well past the target address almost at the end of the road.

I was not wearing my tactical vest, so I pulled onto the (western) side of the road, near the intersection of Estates Place and Sale Road several houses north of the suspect's car. I quickly got out and went to the bed of my truck. About that time, Officers Rosser and Yourkiewicz pulled beside me and asked what was going on. I started putting on my tactical vest and yelled that, "He's right there in the car at the end of the street" (or something to that effect). Rosser asked who I was talking about, and I yelled, "the guy with the gun." Just then, as I put on my vest, the suspect got out of his car still holding the black pistol in his right hand. I yelled

4

"that's him right there! He's still got the gun in his hand!" In response, the suspect looked directly at me then turned away and started quickly moving toward the house located at 3996 Estates Place. He also appeared to have a plastic bag in his left hand.

I quickly grabbed my rifle from the backseat and slung it over my head with the gun strap. By the time I shut the backdoor, the suspect had dipped behind the southwest corner of the house, away from my view. I believed the suspect was deliberately evading me. I got into my truck and accelerated toward the end of the street. Just as I passed the southwest corner of the house located at 3996 Estates Place, however, I saw the suspect. He was approaching a side door inside an open fence gate near the southeast corner of the house.

I immediately slammed on my brakes, came to a screeching halt, and jumped out of my truck and trained my rifle on the suspect. As I did so, the suspect pulled open the storm door. I yelled "U.S Marshals! It's the police!" and repeatedly yelled, "Show me your hands!" The suspect ignored my commands, however. I kept my rifle trained on the suspect, and I quickly moved northeast towards the gate. As I did so, the suspect appeared to be trying to open the main door. I could not see the suspect's hands as his back was to me and the storm door was resting against his body. I repeatedly yelled for him to show me his hands as I neared the gate, but the suspect refused to comply.

I stopped a few feet outside the gate, just as the suspect opened the main door. He started to step forward, but he stopped at the threshold, seemingly in response to my command to show me his hands. He appeared to sigh, and his shoulders drooped and his body slightly slumped. At that moment, I believed the suspect was going to surrender. But immediately thereafter, he turned and looked in my direction while lifting his right arm back toward me, raising and leveling the barrel of the gun in my direction. In that instant, I screamed "drop the gun!" as I

5

stepped left while flipping the rifle's firing mode and shot at the suspect. I stopped firing when the suspect collapsed inside the doorway.

I believe I fired five or six rounds. I believe I fired all of my shots in less than one second. My shots were fired in a northeasterly direction. I was not moving when I fired. My target was the suspect's center mass, and I used my rifle's Aimpoint red-dot sight. I would estimate that I was about 20-25 feet southwest of the suspect when I first exited my truck. At the time I fired, however, I had closed the gap, and I would estimate I was approximately 10-15 feet from the suspect. The backdrop for my shots was the exterior of the house. I did not have any cover or concealment at the time I fired. I would estimate that about 6-8 seconds passed from the time I got out of my truck until I fired my rifle.

Moments after I fired, someone asked whether I was okay, and I turned around and saw Officers Rosser and Yourkiewicz approaching. I told them that the suspect had collapsed into the house and was on the other side of the storm door (which had almost completely closed but was propped open a few inches). I slowly approached the suspect with Officer Rosser providing cover and loudly announced that police were coming into the house and that anyone inside needed to keep their hands where we could see them. I did not hear any response from in the house.

The glass upper portion of the storm door had shattered after I fired, and I could see the suspect lying face down just inside the doorway. I opened the storm door and told Officer Rosser to cover the area to the left (west) of the entrance, which appeared to lead to a living room. I ordered the suspect to show me his hands, but he was not moving or responding. I also noticed blood on his clothing. I grabbed the right side of his body with my right hand and rolled him onto his back, revealing the black semi-automatic handgun underneath his torso.

6

Exhibit B

I told Officer Yourkiewicz to cover the area to the right (east) of the entrance, which led to a kitchen. Around that time, an older woman poked her head into the kitchen and asked what was going on. I told her that a man with a gun was coming into her house, and she replied something to the effect that no one was bringing guns into the house. She went back around the corner and left the kitchen, and I told her she needed to go toward the front of the house. I yelled that anyone else in the house that was coming out needed to show me their hands. I heard what sounded like a male's voice coming from the living room. I asked the man who the suspect was, but he did not know. I asked again why a man would be coming into his house with a gun. I believe he replied that nobody would be coming into the house with a gun. Officer Rosser then informed the man that the suspect did in fact have a pistol. I then announced that anyone in the house needed to exit out of the front door.

As Officer Yourkiewicz was airing information over the radio, I asked him if he had aired the address, and he replied that he had not seen the numbers. I told Officer Rosser to cover the suspect, and I ran to the front of the house, saw the address, and aired that information. I also aired "shots fired" and said that a medic was needed for a gunshot wound. I returned to Officers Rosser and Yourkiewicz, and a brief time later heard sirens approaching the residence. I again asked Officer Rosser to cover the suspect, and I went to the front of the house to direct the responding officers. Several officers from CPD arrived, and I pointed them to the suspect's location on the south side of the house.

Medics were not yet on scene, so Todd Barnhart, a deputy from the Delaware County Sheriff's Office (and member of SOFAST), performed chest compressions on the suspect. As he did so, officers told those inside the house to exit out of the front door so that the house could be cleared. Once they had done so, I helped an officer clear a bedroom, then an officer said that the

7

basement also needed cleared. I told that officer to let me know once he cleared the basement so that I could let medics know it was safe to arrive on scene.

I went outside and met up with Officer Rosser. He then asked several CPD officers to take control of the scene. About that time, an officer aired that the house was clear. I aired that it was safe for medics, who arrived a brief time later. I directed them to the suspect's location on the south side of the house. As medics treated the suspect, I went to the front yard and met up with several members of the FCSO SWAT team, one of whom then transported me from the scene to SWAT headquarters. This ended my involvement with this incident.

I was in fear for my life at the times I fired my weapon. Before confronting the suspect, I had observed him pumping his gun into the air at the intersection of Karl Road and Ferris Road. He appeared agitated and looked as though he was yelling as he pumped his gun. I could see the suspect clearly since his vehicle was only about 10 feet from my truck, and I was sitting in an elevated position relative to his car. I could also see that the suspect's gun had an extended magazine.

Not only was the suspect pumping his gun into the air, but he also pointed the gun at the driver of a passing vehicle (tracking the vehicle as it passed northbound), before turning onto Ferris Road and pointing the gun directly at me as he drove. I believed the suspect might fire at me, so I quickly ducked down to avoid being shot while simultaneously reaching for my pistol. I aired over the U.S. Marshal radio channel what I observed. I presumed that Officers Rosser and Yourkiewicz (who were one or two vehicles behind my truck at the Karl Road intersection) heard what I aired since they followed me back to Estates Place. I also believed the SOFAST team members that had just executed the warrant would also likely be listening to the Marshal channel. Those individuals included Marshal Youngless, Todd Barnhart, Mark Brown, Matt

8

Carter, Dave Chambers, Dave Webb, and possibly others. And in fact, U.S. Marshal Youngless was listening since he aired and asked for my location and whether the suspect was the same person we had been looking for earlier that morning.

Based on the suspect's actions of pointing his weapon at me and the other driver, I intended to detain him for a field interview and/or an arrest. In fact, I believed I was duty-bound under Ohio law to investigate/arrest the suspect. By the time I made a U-turn, the suspect's car had disappeared from my view. While searching for the suspect, I happened to turn onto Estates Place as it was the first available street off Ferris Road. A moment after I turned onto Estates Place, I saw the suspect's car at the end of the road. The car was parked in front of the house at 3996 Estates Place, on the eastern side of the road, facing south.

I intended to approach the suspect, but I realized I did not have a weapon or my tactical vest (which identifies me as a U.S. Marshal and protects against gunfire). I pulled over several houses north of the suspect's location, near the intersection of Sale Road and Estates Place. As I quickly grabbed my tactical vest from the bed of my truck, I identified the suspect's car to Officers Rosser and Yourkiewicz (who I believed at the time had heard my radio transmissions). It was at that time the suspect exited his car and (I believe in response to my yelling) looked directly at me, still holding the black semi-automatic pistol in his right hand. From where I was standing next to my truck, my tactical vest that displays "U.S. MARSHAL" would have been clearly visible to the suspect.

In the seconds before firing, I loudly identified myself as a police officer and repeatedly ordered the suspect to show me his hands; however, he continuously ignored my many commands and refused to surrender. From the time I got out of my truck until the suspect opened the main door, I could not see his hands since the storm door was resting against his body and he

9

Exhibit B

was facing away from me (with his back to me). Just before I fired, the suspect had opened the main door and taken a step forward. I ordered him to show me his hands, and he abruptly stopped, sighed, and slumped forward. I have encountered very similar actions from suspects many times, and each time the suspect surrendered, leading me to believe this suspect would do the same.

But the moment after his shoulders drooped, he quickly turned his head and torso right (in my direction) to confirm my location, while he suddenly and unexpectedly started to raise his right arm back. As he did so, I saw he was still holding the gun, raising the barrel upwards in my direction. I believed he intended to shoot me and that I would be killed—especially because I had no cover or concealment and I was only a short distance away. I screamed "drop the gun!" and moved left (north) as fast as I could, in an attempt to escape the path of the barrel of the gun. He refused to drop the gun, however. And after taking a step left, I fired at the suspect. At the time I fired, I did not think I had any other reasonable option to protect my life from the deadly threat presented by the suspect's actions.

I do not recall the suspect saying anything during this incident. At no point did I ever touch the suspect's weapon, nor did I witness anyone else touch the weapon. After this incident, I learned the suspect's name is Casey Goodson, Jr. I do not know the suspect, and I do not believe I have ever had any prior encounters with him.

This concludes my statement.

Deputy Michael Jason Meade, Badge #1027