**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **STATE OF OHIO,** : | |
| Plaintiff, : | |
| | CASE NO. 2:21-CV-5587 |
| vs. : | |
| | JUDGE SARGUS |
| **MICHAEL JASON MEADE,** : | MAGISTRATE JUDGE VASCURA |
| Defendant. : | |

**STATE OF OHIO'S RESPONSE TO DEFENDANT'S MEMORANDUM IN OPPOSITION AND SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO THE STATE OF OHIO'S MOTION FOR SUMMARY REMAND**

To exercise jurisdiction over this Ohio criminal case, this Court must first determine whether when Defendant Michael Jason Meade shot Casey Goodson, Jr. six times in the back and buttocks as Mr. Goodson entered his own residence, Meade was acting as a Special Deputy of the United States Marshals, or a person acting under the direction of the United States Marshals Service, and whether Meade was engaged in an act under the color of the office of United States Marshals Service. 28 U.S.C. § 1442(a)(1). The State of Ohio submits that the record establishes that Meade was not acting as a federal officer, nor in the performance of federal duties at the time of the shooting, and Meade was not acting under the color of a federal office when he shot Goodson. As such, Meade's Notice of Removal fails as a matter of law, and this case must be remanded to state court.

**I.     Removal**

The relevant portion of the federal officer removal statute, 28 U.S.C. § 1442, reads:

1

> A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> (1) The United States or any agency thereof or any officer (or person acting under that officer) of the United States or any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of revenue.

28 U.S.C. § 1442(a)(1).

Accordingly, to qualify for removal pursuant to 28 U.S.C. § 1442(a)(1), Meade has to establish three elements: (1) that he was an officer of the United States or of a federal agency; (2) that the state's prosecution is either (a) for or relating to any act under the color of such office or (b) on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals; and (3) that the defendant must raise a colorable federal defense to prosecution by the state. *Mesa v. California*, 489 U.S. 121, 125-129, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989); *see also Texas v. Kleinert*, 855 F.3d 305, 311-312 (5th Cir. 2017).

Even full time federal officers and employees are not, merely because they are such, granted immunity from prosecution in state courts for crimes against state law. *State of Colorado v. Symes*, 286 U.S. 510, 52 S.Ct. 635, 76 L.Ed. 1253 (1932). Rather, the purpose of federal officer removal is the protection of federal *authority*:

> [The federal government] can only act through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a State court, for an alleged offence against the law of the State, yet warranted by the Federal authority they possess, and if the [federal] government is powerless to interfere at once for their protection, -if their protection must be left to an action of the State court,- the operations of the general government may at any time be arrested at the will of one of its members.

*New York v. DeVecchio*, 468 F.Supp.2d 448 (E.D. NY 2007), quoting *Tennessee v. Davis*, 100 U.S. 257, 263, 25 L.Ed. 648(1879).

2

In *Maryland v. Soper*, 270 U.S. 9, 46 S.Ct. 185, 70 L.Ed. 449 (1926), four federal prohibition agents and their chauffeur, were indicted for murder in state court and sought removal, alleging that the killing occurred at a time when they were engaged in the discharge of their official duties, in the course of an official investigation. The United States Supreme Court held that this pleading was insufficient, because the burden was on the agents to demonstrate that they were not doing any act other than an official act at the time of the murder or that the murder occurred under the color of their federal official duty. *Id.* at 35. Thus, even federal employees must demonstrate a causal connection from their actions giving rise to the criminal offense for which they are charged to their federal authority, and exclude the possibility that it was based on acts not justified by his federal duty. *Id*. at 33.

For individuals like Meade who are not federal officers, but merely "acting under a federal officer," the removal statute's scope is much more limited.  The Supreme Court held that while the words "acting under" are broad and the statute must be liberally construed, the statute's language, context, history and purpose limit its construction. *Watson v. Philip Morris Companies, Inc.,* 551 U.S. 142, 147, 127 S.Ct. 2301, 2307, 168 L.Ed.2d 42 (2007).  In examining the history of the statute, the Court found that the purpose of the statute was to protect the federal government from the interference with its "operations" that would ensue were a state able, for example, to arrest and bring to trial in a state court for an alleged offense against the law of the state, officers and agents of the federal government acting within the scope of their authority.  *Id*. at 150, quoting *Willingham v. Morgan*, 395 U.S. 402, 406, 89 S.Ct. 1813, 23 L.Ed.2d. 396 (1969).  The Court further noted that the statute authorized removal by parties only if they were authorized to act with or for federal officers or agents in affirmatively executing duties under federal law. *Id*. at 151, quoting *City of Greenwood v. Peacock*, 384 U.S. 808, 824, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966).

3

In examining the phrase "acting under" a federal "officer" or "agency," the Supreme Court determined that the phrase "must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Willingham* at 151-152, citing *Davis v. South Carolina*, 107 U.S. 597, 600, 2 S.Ct. 636, 27 L.Ed. 574 (1883).

This distinction is reflected in all of the cases to which Meade cites in support of his Notice of Removal. They are easily distinguished from the case at bar, as there were findings by the court that all were either within the scope of their federal duties or acting at the direction of a federal officer.

As discussed more fully below, Meade's pursuit of Goodson, assuming it was justified for the purpose of this argument, was the execution of a duty under Ohio law and as a Franklin County Sheriff's Deputy, not as a Special Deputy Marshal on the SOFAST Task Force.

## II. Factual Background

At the time of the shooting, Meade was employed by the Franklin County Sheriff's Office as a deputy sheriff. Through his position as a deputy sheriff, Meade was regularly assigned to Special Weapons and Tactics ("SWAT"), A-Company, and was also concurrently assigned to the Southern Ohio Fugitive Apprehension Strike Team ("SOFAST") by agreement between the Franklin County Sheriff and the United States Marshal's Service. (Doc #: 11-2, PAGEID #: 70; State's Ex. 1). On December 4, 2020 (the day of Goodson's murder), Meade participated in a SOFAST mission for the specific purpose to locate and execute an arrest warrant for Kendale Barbour, who was wanted on a felony trafficking warrant. (Doc #:1, PAGEID #: 8; Doc #:11-2, PAGEID #: 71). The search for Barbour that day was unsuccessful and the SOFAST mission was over when Meade observed Goodson while stopped at a traffic light at the intersection of Ferris

4

Road and Karl Road in Columbus, Ohio. (Doc #: 1, PAGEID #: 8; Doc #: 11-2, PAGEID #: 72-73).

At this point, Meade neither acted as a federal officer nor under the direction of any federal officer in pursuing Goodson. Without order, direction, or supervision of his SOFAST team leader Dave Youngless, Meade took it upon himself to conduct a U-turn and pursue Goodson. (Doc #: 11-2, PAGEID #: 73). According to Meade, he observed Goodson with a handgun while driving, yelling and aiming the gun toward the windshield. (Doc #: 1, PAGEID #: 8-9; Doc #: 11-2, PAGEID #: 72). If the conduct Meade observed was criminal, it could only be a violation of Ohio law. The only federal prohibition against merely carrying or possessing a loaded weapon in a motor vehicle is when the motor vehicle is in a national park. See 36 C.F.R. § 2.4. Meade did not observe Goodson anywhere near a national park, and even this would be outside of any federal duty Meade was authorized to perform.

Indeed, Meade admits that he pursued Goodson under Ohio law. He writes, "In fact, I believed I was duty-bound *under Ohio law* to investigate/arrest the suspect." (Emphasis added; Doc #: 11-2, PAGEID #: 78). See also R.C. 2935.03 (providing, in pertinent part, that a *deputy sheriff* shall arrest and detain, until a warrant can be obtained, a person found violating, within the limits of the political subdivision, a law of this state. Emphasis added.). Meade's pursuit of Casey Goodson, Jr. was therefore an investigation into a possible violation of Ohio law through Meade's capacity as a Franklin County Deputy Sheriff. Further, Meade admits that he knew Goodson was not Barbour at the time he began pursuit and he conveyed that his pursuit was unrelated to the mission to SOFAST Team Leader, Dave Youngless. (Doc #: 1, PAGEID #: 8; Doc #:11-2, PAGEID #: 73).

5

Thus, the only reason Meade could have lawfully pursued and investigated Goodson was for a potential violation of state law crimes - R.C. 2923.16(B)[1], improper handling of a firearm in a motor vehicle, or R.C. 2903.21(A), for allegedly pointing a gun at a driver of another car or at him, a misdemeanor of the first degree. Accordingly, this investigation of possible offenses under Ohio law, unrelated to the SOFAST assignment of arresting Kendale Barbour is outside the scope of Meade's SOFAST duties, outside the direction he received from his SOFAST Team Leader, and unrelated to any action he would take under the color of federal law. Because Meade's conduct does not directly relate to the participation in a federal investigation or as a result of his federal duties, he is not entitled to removal.

    **A.**    **Meade's Appointment to SOFAST is as a Special Deputy Marshal and not as a Deputy Marshal.**

It is important to distinguish that Meade was not appointed as a Deputy United States Marshal. His duties and powers as a Special Deputy Marshal are specific and limited to those bestowed upon him through his appointing documents. (State's Ex. #2). As such, Meade is not vested with the panoply of general duties and powers of a Deputy United States Marshal. Notably in the Agency's Official Statement, the Marshals Service notes that Meade's assignment to SOFAST gave him limited authority to work U.S. Marshals cases. (State's Ex# 3). Although not definitive, the United States Marshals' Service conclusion that Meade acted in his capacity as a Franklin County Sheriff's Deputy is persuasive authority for that finding. (Id.). This is further evidenced in myriad ways set forth below.

    **B.**    **Special Deputation Program Policy Directive**

---

[1] The State notes that R.C. 2923.16(B) does not apply to Casey Goodson as a valid concealed handgun licensee. R.C. 2923.16(B)(5).

In his Supplemental Memorandum, Meade submits Policy Directive 8.9 Arrests, that he argues apply. (Doc #: 11-1). Meade is wrong, as the USMS Policy Directive 17.11 Special Deputation Program govern his appointment instead. (State's Ex. # 4). The policies Meade relies upon apply only to Deputy Marshals, not Special Deputy Marshals. Section 17.11(D)(4) of the Special Deputation Program Policy Directive provides that under Title 18, special deputies can be authorized to perform up to five different tasks as Special Deputy Marshals, and which tasks each special deputy is authorized to perform are noted on that individual's Special Deputation Oath of Office, Authorization, and Appointment. (State's Ex. # 2). In Meade's case, he was only appointed as a special deputy to seek and execute arrest and search warrants, pursuant to Section 17.11(D)(4)(a).

Notably, and contrary to the general law enforcement powers of the United States Marshals Service, Meade was not authorized make arrests without a warrant if there are reasonable grounds to believe that the suspect has violated or is violating federal law pursuant to Section 17.11(D)(4)(b). The United States Marshals Service had the authority to grant him those powers, but did not do so. Therefore, Meade could not make warrantless arrests for violations of federal law he encountered as a Special Deputy Marshal. Again, Meade allegedly witnessed only a violation of Ohio law, and he felt duty-bound under Ohio law to investigate. Accordingly, Meade was acting as a Franklin County Sheriff's Deputy and not as a Special Deputy Marshal when pursuing Goodson.

    C.    **Terms of Meade's Special Deputation**

Unlike a Deputy United States Marshal, a special deputy is not an employee of the federal government. It is not disputed that Meade was an employee of the Franklin County Sheriff's Office. Therefore, he is not in the service of the federal government, and only carries powers for

7

his specific appointment.  As mentioned above, Meade's Special Deputation appointment was limited to one assignment: "To seek and execute arrest and search warrants supporting a federal TF under Title 18 Authority." (State's Ex. # 2).  The terms of his appointment are further limited by the following language:

> The individual named herein is appointed, under authority delegated by the Attorney General, to perform the duties of the Office of Special Deputy United States Marshal as directed by the appropriate official of the United States Marshal Service or some other appropriate Federal Official as so designated.  This appointment does not constitute employment by the United States Marshals Service, the United States Department of Justice, or the United States Government. The appointee agrees to perform the duties required under this Special Deputation with the knowledge that he or she is neither entering into an employment agreement with the Federal Government or any element thereof, nor being appointed to any position in the Federal Service by virtue of this special deputation. ***The appointee understands and acknowledges that the authorities vested in him or her by this special deputation can only be exercised in furtherance of the mission for which he or she has been specially deputized and extend only so far as may be necessary to faithfully complete that mission***.  Moreover, those authorities terminate at the expiration of the term of the Special Deputation.

(Emphasis added. State's Ex. # 2).

Meade is therefore conflating his assignment on the SOFAST mission with his authority to act as a Special Deputy Marshal. Meade's duty to make an arrest for a violation of state law under R.C. 2935.03 was not a necessary act required to complete the mission of searching for Kendale Barbour.  Meade admits that it was unrelated to his mission on December 4, 2020.  Accordingly, Meade's actions extend beyond the scope of his special deputation.

### D. The SOFAST Mission

SOFAST's mission is set forth in the Memorandum of Understanding (MOU) between the Franklin County Sheriff's Office and the United States Marshals Service.  (State's Ex # 1).  The primary mission of SOFAST is to investigate and arrest, as part of joint law enforcement operations, people who have active state and federal warrants for their arrest.  (Id.).  The MOU

further provides that the intent in creating the task force is to investigate and apprehend local, state, and federal fugitives. (Id.). Each participating agency can refer cases to SOFAST, but cases are solely adopted at the discretion of the District Chief Deputy Marshal. (Id.). SOFAST personnel are then assigned federal, state, and local fugitive cases for investigation. The parties agree that Casey Goodson, Jr. was not a fugitive, nor was he the subject of an approved SOFAST investigation on December 4, 2020.

### III.  Meade's Arguments

Meade argues that courts have consistently treated local law enforcement agents acting as a part of a federal task force as federal officers. (Doc #: 7, PAGEID #: 42). What Meade overlooks, though, is that in all the cases upon which he relies, the local task force officers were acting within the scope of the federal task force to which they were assigned or at the direction of supervising federal officers.

In *United States v. Martin*, 163 F.3d 1212, (10th Cir. 1998), Martin was indicted under 18 U.S.C. § 1114, which prohibits the killing or the attempt to kill any officer or employee of the United States or any agency thereof, for threatening the life of Oklahoma Police Officer Det. Sgt. Brian O'Rourke. *Id*. at 1213. O'Rourke was deputized as a special deputy of the FBI to participate in a federal narcotics investigation. *Id*. The investigation resulted in numerous federal indictments being returned, including two of Martin's friends. One of those friends, Bennett, began cooperating with investigators and disclosed that Martin made several threat's against O'Rourke's life. Martin moved to dismiss his indictment on the grounds that O'Rourke was not a federal officer, which was denied by the district court. Martin appealed after he was convicted by a jury. The Tenth Circuit Court of Appeals affirmed the conviction and reasoned that when an officer is designated as a special deputy of a federal agency and is performing federal duties, that officer is

9

a protected federal officer under §§ 115 and 1114. *Id*. at 1215.  The court found that based upon the facts presented, the threats against O'Rourke directly resulted from his participation in the federal investigation and he was entitled to the protection of federal law for threats against his life. *Id*.  Unlike O'Rourke, Meade's conduct does not directly relate to the participation in a federal investigation or as a result of his federal duties. Meade was not in the course of a federal investigation when he pursued Goodson, and was never assigned by SOFAST superiors to investigate Goodson.  Consequently, *Martin* is inapplicable to the instant case.

Meade also cites to *United States v. Diamond*, 53 F.3d 249 (9th Cir. 1995), for the proposition that a Special Deputy Marshal is a federal officer regardless of whether the conduct he was investigating turned out to be a state or federal offense, or none at all.  Again, Meade oversimplifies the holding in *Diamond*.  Diamond was also indicted for assaulting a federal officer in violation of 18 U.S.C. § 111, and also argued that the victim in the case, James Strovink, was not a federal officer within the meaning of §§ 111 and 1114.  *Id*. at 250.  Strovink was a county sheriff's deputy that was cross-deputized as a special deputy United States Marshal and assigned to the FBI Fugitive Task Force.  *Id*.  Strovink and FBI Agent Renning were engaged in federal duties, watching a shopping center for suspects involved in recent bank robberies when they observed Diamond, breaking into a series of cars in the parking lot. *Id*.  At Renning's suggestion, the officers stopped Diamond, who injured Strovink as he fled the scene.  While Diamond argued that § 111 did not apply to Strovink, since Diamond was only committing a state crime and not a federal crime, the district court and the Ninth Circuit Court of Appeals rejected those arguments, as it was undisputed in that case that Strovink was on surveillance through an assignment by the Fugitive Task Force, he was following the orders of his federal supervisor FBI Agent Renning, and assisting a federal agent at the time he was assaulted. *Id*. at 252.  Meade cannot establish the

same. He was not acting within the course of his federal assignment or at the direction of his federal supervisor at the time he shot and killed Casey Goodson, Jr. No federal agency or agent directed Meade to pursue or kill Casey Goodson, Jr.

Similar reasoning was employed by the District Court for the Northern District of Illinois in *Amoalohene v. Bobko*, 792 F. Supp 605 (N.D. Ill. 1992), when it held that a §1983 action would not lie against Bobko and fellow Chicago police officers who were deputized DEA agents, for conduct occurring during an arrest for violation of municipal code. Unlike Meade, the Chief of the Civil Division of the Attorney General's Office certified that Bobko and the other Chicago officers were acting within the scope of their federal employment at the time of the incidents alleged in the complaint. *Id.* at 608. In this case, the official position of the United States Marshals Service is that Meade was acting on his own and in his independent authority as a Franklin County Sheriff's Deputy within his home jurisdiction when he encountered Goodson, and throughout the subsequent incident leading to Goodson's death. (State's Ex. 3).

In *Bobko*, the court looked to the terms of the Task Force Agreement and found that the Chicago officers were performing their duties under that agreement by engaging in traditional methods of investigation in order to effectively prosecute criminal conduct in the courts of the United States and the courts of Illinois. *Id*. The court reasoned that an arrest for a municipal code violation incident to activities in connection with the joint task force, did not convert the status of the officer to that of state actors. *Id*. Again, there were specific findings in *Bobko* that the officers were engaged in their federal duties at the time the incident occurred. It is that element, that he was engaged in federal duties, that is entirely lacking in Meade's case.

Contrary to Meade's argument, the State of Ohio does not suggest that Meade had to turn a blind eye to illegal behavior he might have encountered. Rather, the fact that Meade acted outside

his assignment from SOFAST and not at the direction of his supervisor of SOFAST, means simply that he is not entitled to removal of the case. Meade argues that as a member of SOFAST, he is entitled to exercise the same powers which a county sheriff may execute, but Meade's argument is misplaced. Meade was still a deputy sheriff.

The plain language of 28 U.S.C. § 564 only applies to United States Marshals, Deputy Marshals and such other officials. Meade is neither a marshal nor a deputy marshal, and has cited to no authority for the proposition that the "such other officers" includes special deputy marshals. This Court need not even reach that issue as § 564 is moot as applied Meade, as he has already been deputized with the powers of a county sheriff through his employment with Franklin County. Meade only relies upon § 564 in an attempt to bootstrap his claim that he was acting under color of federal law. Meade did not need to rely upon the authority of § 564 to investigate the activity of Goodson[2]. He already possessed the powers of a deputy sheriff through his employment with Franklin County.

Meade seems to argue that pursuant to the Deputy Marshal Policy Directives Section 8.9 for arrests, 28 U.S.C. § 561(g), 28 C.F.R. § 0.111, and the Attorney General's National Anti-Violent Crime Initiative confer upon Meade the authority to act as a state actor, acting as a federal actor, acting as a state actor. Meade's argument is unpersuasive. Again, this directive clearly applies to Deputy Marshals, not Special Deputy Marshals. This is evidenced by the fact that 28 U.S.C. § 561(g) merely provides authority for the Director of the United States Marshals to supervise and direct the United States Marshals Service in the performance of its duties.

---

[2] The State of Ohio does not concede that Goodson was engaged in any criminal activity, but if Meade followed Goodson under suspicion of waiving a gun around in his vehicle as Meade claims, that would be a violation of Ohio law, not federal law. There is no federal prohibition for having a firearm in a motor vehicle outside of a national park.

Likewise, 28 C.F.R. § 0.111 describes the general functions of the United States Marshals Service. The only National Anti-Violent Crime Initiative that undersigned counsel could find is a departmental memorandum that only applies to employees of certain federal agencies, and encourages them to work with state and local officials to form task forces to reduce violent crime. Furthermore, Section 17.11(C) of the Special Deputation Program provides additional authority for its directives, and only relates to the authority of the United States Marshals Service to supervise and administer the program. It confers no rights or authority on the special deputies. That is accomplished through the Oath of Office and Appointment.

Meade relies upon *Texas v. Kleinert*, 855 F.3d 305 (5th Cir. 2017), for the proposition that he was a federal officer entitled to removal to federal court for his criminal prosecution, but the facts of Kleinert are distinguishable in legally significant ways. At the outset, it is important to note that *Kleinert* is not binding on this Court. In finding that Kleinert was entitled to removal, the court found that Charles Kleinert was an Austin Police Officer appointed as a Special Deputy of the FBI and charged with the duties of investigating violations of the criminal laws of the United States, specifically bank robberies. *Id*. at 309. Unlike Meade, there is no indication in the facts of Kleinert that he retained duties as an Austin Police Department officer concurrently with his special deputation. *Id*. Also, unlike Meade, Kleinert's interaction with the victim in the case, Larry Jackson, occurred while Kleinert was at the bank to obtain surveillance footage in the course of his duties for the FBI. Jackson was trying to withdraw money from bank, which was closed due to the robbery that morning, under the name of a large account holder who was known to the bank employees. *Id*. Moreover, the State of Texas did not dispute that Kleinert was a federal officer, whereas the State of Ohio submits that Meade was not a federal officer when he was not acting in furtherance of his federal duties. *Id*. at 311. When Meade was investigating a crime under Ohio

law that was not approved and adopted as a SOFAST case, he was acting in his capacity as a sheriff's deputy. Therefore, Meade cannot meet the first element required for removal.

The Fifth Circuit further held that to satisfy the second element, "the color of office test," the defendant must show a causal connection between the charged conduct and asserted official authority. *Id*. at 312, quoting *Willingham v. Morgan*, 395 U.S. 402, 409, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969). The court then reasoned that Kleinert satisfied that element because Kleinert was a specially deputized federal agent who investigated bank robberies, a federal crime; that he first encountered Jackson while investigating a bank robbery; and during their interaction, Kleinert developed probable cause to believe that Jackson was trying to rob or defraud the same bank – also federal crimes, which resulted in the chase that gave rise to Jackson's shooting. *Id*. The Fifth Circuit noted that Kleinert testified that federal law authorized him to arrest Jackson based upon probable cause, and that Kleinert engaged in the conduct that the state charged as criminal during the arrest. *Id*. at 312-313.

Unlike Kleinert, Meade cannot make the same showing. Meade had completed his federal responsibilities in looking for Kendale Barbour prior to his first observation of Goodson in the intersection of Karl Rd. and Ferris Rd. Meade has only alleged that he had probable cause to believe Goodson was violating Ohio law. Meade then pursued Goodson pursuant to his state law duties. His special deputation appointment provided no authority for him to investigate and make warrantless arrests pursuant to federal law, so his only power to detain and investigate Goodson came from his reasonable suspicion and probable cause determination under Ohio law. Therefore, Meade was not acting under the color of federal authority or in the enforcement of federal law at the time he shot Casey Goodson in the back as Goodson was entering his own residence. As such, Meade has failed to meet the second element for removal.

14

Similarly, because the facts in the case at bar establish that Meade was, at most, acting as a sheriff's deputy, he has failed to establish or support a plausible claim that he is entitled to Supremacy Clause immunity. Such immunity applies only when a federal officer is held in state court to answer for an act that federal law authorized him to undertake, and in doing that act, he did no more than was necessary and proper. *Kleinert* at 314, quoting *Cunningham v. Neagle*, 135 U.S. 1, 75, 10 S.Ct. 658, 34 L.Ed. 55 (1890).

Not only was Meade unauthorized by federal law to pursue and investigate Goodson, he failed to take minimal actions to safely encounter Goodson. In pursuing Goodson, Meade made no attempt to gather any background information on Goodson during the pursuit. He did not run the plates on the car that Goodson was driving through dispatch. He did not activate his lights and/or sirens in an attempt to pull Goodson over. He failed to effectively communicate with other SOFAST officers in the area about whom he was pursuing. Nor did he delay his approach of Goodson to formulate a safe strategy with the other officers. Instead he stopped, put on his tactical gear, drew his rifle, and left his fellow officers behind. Thus, regardless of his subjective beliefs, his actions were objectively unreasonable. Critically, he has failed to establish that Goodson was a fugitive with an active warrant for his arrest, assigned to him by his SOFAST supervisor. Therefore, Meade has failed to establish all three elements necessary for removal.

### IV. Conclusion

Based on the foregoing, at time of the shooting, the Defendant Meade was not performing a mission for the United States Marshals, nor was he acting within the scope of any federal authority he may possess. He was a Franklin County deputy sheriff, performing a duty under Ohio law, and investigating a violation of Ohio law. Accordingly, this Court is without jurisdiction and this case must be remanded to the Franklin County Court of Common Pleas.

Respectfully submitted,

/s/ H. Tim Merkle
H. Tim Merkle 0023458
Special Prosecuting Attorney
522 N. State Street, Suite A
Westerville, OH 43082
Phone: (614) 839-5700
Fax:  (614) 839-4200
htm@ejhlaw.com

/s/ Gary S. Shroyer
Gary S. Shroyer 0023439
Special Prosecuting Attorney
580 S. High St., Suite 300
Columbus, OH 43215
Phone: (614) 221-5500
Fax: (614) 221-5590
gary@shroyerlaw.com

/s/ Elizabeth A. Ellis
Elizabeth A. Ellis 0074332
and
/s/ Joshua T. Shaw
Joshua T. Shaw 0087456
Special Assistant Prosecuting Attorneys
for Mathias H. Heck, Jr.  0014171
Special Prosecuting Attorney
PO Box 972
301 West Third Street
Dayton, OH 45422
Phone: (937) 225-5757
Fax: (937) 496-6555
ellise@mcohio.org
shawj@mcohio.org

**CERTIFICATE OF SERVICE**

I hereby certify that on February 10, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Elizabeth A. Ellis
Elizabeth A. Ellis (0074332)