UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

STATE OF OHIO,

    Plaintiff,

    v.

MICHAEL JASON MEADE,

    Defendant.

Case No. 2:21-cv-5587
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

This matter is before the Court on Plaintiff State of Ohio's Motion for Summary Remand (ECF No. 5). Defendant filed a Response in Opposition (ECF No. 7) and both parties filed supplemental memoranda (ECF Nos. 11, 15). The Court conducted an evidentiary hearing on February 11, 2022, pursuant to 28 U.S.C. § 1445(b)(5). For the following reasons, Plaintiff's motion for remand is **GRANTED**.

### I. BACKGROUND

This case arises from Defendant Michael Jason Meade's fatal shooting of Casey Goodson, Jr. on December 4, 2020, in Columbus, Ohio. Defendant Meade was then a law enforcement officer working for the Franklin County Sheriff's Department and assigned to the Southern Ohio Fugitive Apprehension Strike Team ("SOFAST"). SOFAST is a law enforcement unit operated and supervised by the United States Marshals Service ("USMS") and staffed by federal, state, and local law enforcement officers. SOFAST's purpose is to locate and apprehend fugitives with active state and federal warrants for their arrest. All state, county, and local SOFAST officers become special deputy U.S. marshals upon their induction to SOFAST.

1

Since 2017, Defendant Meade worked for SOFAST full-time, from 6:00 a.m. to 2:00 p.m., Monday through Friday, unless he was needed by the Franklin County Sheriff's Department. He reported to a USMS Task Force Office and was supervised by a U.S. Deputy Marshal. In the field, Meade wore a bullet-proof vest with USMS insignia, drove a USMS unmarked vehicle, and paid for gas using a USMS-issued credit card. He communicated with other SOFAST members using his Franklin County Sheriff's Department radio tuned to a special channel accessible only to SOFAST members.

Meade's SOFAST Oath of Office stated that he was not an employee of the federal government. He retained his position and authority as a state police officer employed by the Franklin County Sheriff's Department. At all times, Meade was compensated entirely by Franklin County. When he worked overtime for SOFAST, the USMS reimbursed the Franklin County Sheriff's Department.

On December 4, 2020, Defendant Meade and two other SOFAST members attempted to execute an arrest warrant for a fugitive in northeast Columbus. After an unsuccessful search for the fugitive, the SOFAST team leader directed them to return to the Task Force Office. While driving back, Defendant Meade saw Casey Goodson, Jr. across an intersection holding a handgun in a car. Mr. Goodson was not the fugitive whom the SOFAST officers were searching for that morning. Goodson was not a fugitive or the subject of an arrest warrant.

According to Defendant Meade, Mr. Goodson aimed the gun at another driver, and, when the light turned green, aimed it at Meade's vehicle while passing him in the intersection. Meade reported his observations on the SOFAST radio channel and turned his car around to pursue Goodson. The two other SOFAST members, who drove a second vehicle behind Meade, turned and followed. Neither of the two were deputy U.S. marshals nor supervisors of SOFAST.

Special Deputy U.S. Marshal Ryan Rosser, one of the two other responding officers, testified during the evidentiary hearing that Mr. Goodson parked his car at the end of a residential street and started walking towards a house. According to Rosser, Meade stopped halfway down the street, slipped on his USMS vest, and retrieved his rifle. Meade told Rosser and the other officer that Goodson had a gun and then drove further down the street towards Goodson. Rosser testified that Meade yelled, "show me your hands" and approached Goodson. Following a brief interaction, Meade fired several shots at Goodson, who died shortly after.

Defendant Meade was indicted by the Franklin County Grand Jury for two counts of murder and one count of reckless homicide in Case No. 21-CR-5052. He timely removed the case to federal court. (ECF No. 1.) The State of Ohio thereafter filed a motion for summary remand. (ECF No. 5.) The motion is fully briefed and ripe for review. (ECF No. 7, 11, 15.)

## II. STANDARD

Congress has allowed federal officers to remove state cases filed against them to federal court for more than two centuries. *See Willingham v. Morgan*, 395 U.S. 402, 405 (1969) (tracing history of federal officer removal statutes). The history of federal-officer removal originates in the Supremacy Clause:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2.

Although the Supremacy Clause refers only to the "Constitution" and "Laws," "its implication is that states may not impede or interfere with the actions of federal executive officials when they are carrying out federal laws." *Wyoming v. Livingston*, 443 F.3d at 1217. This principle

was established by the Supreme Court in *McCulloch v. Maryland*: "the states have no power…to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." 17 U.S. (4 Wheat.) 316, 436 (1819).

The federal government's concern is that if federal officers "can be arrested and brought to trial in State court, for an alleged offense against the law of the State, yet warranted by the Federal authority they possess," then the federal government "may at any time be arrested" by a state. *Tennessee v. Davis*, 100 U.S. 257, 406 (1880). Thus, to protect its officers acting under federal authority from state interference, the federal government must allow them to remove state cases to federal court. *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007) (citing *Willingham*, 395 U.S. at 406). As such, the removal statute should be "liberally construed." *Colorado* v. *Symes*, 286 U.S. 510, 517 (1932). At the same time, the Court has emphasized a strong judicial policy against federal courts disrupting state criminal proceedings. *See Mesa v. California*, 489 U.S. 121, 138 (1989). "[U]nder our federal system, it goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government. *Id.* (quoting *Arizona v. Manypenny*, 451 U.S. 232, 243 (1981)).

Federal-officer removal is currently authorized by 28 U.S.C. § 1442, which states, in pertinent part:

> (a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

> (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

To remove his or her case to federal court, a federal officer must "file in the district court of the United States…a notice of removal…containing a short and plain statement of the grounds for removal." *Id.* § 1455(a). The filing "shall not prevent the State court in which such prosecution is pending from proceeding," but the State court may not enter a judgment of conviction unless the case is first remanded. *Id.* § 1455(b)(3). Once the notice of removal is filed, the district court shall make an order for summary remand if "it clearly appears…removal should not be permitted." *Id.* § 1455(b)(4). Otherwise, the court "shall order an evidentiary hearing to be held promptly" and, after such hearing, determine whether removal is permitted. *Id.* § 1455(b)(5). If removal is permitted, the district court "shall so notify the State court in which prosecution is pending, which shall proceed no further." *Id.* § 1455(b)(5).

### III. ANALYSIS

To establish a basis for removal, Defendant Meade must show: (1) he was an "officer, or any person acting under that officer, of the United States"; (2) he is sued "for or relating to any act under color of such office"; and (3) a "colorable federal defense." *Mesa,* 489 U.S. at 129 (quoting 28 U.S.C. § 1442(a)); *Abernathy v. Kral*, 779 F. App'x 304, 307 (6th Cir. 2019).

### A. Federal Officer

Defendant Meade meets the first element because he was both a federal officer and a state officer at the time of the shooting. He was an "officer…of the United States" because he worked full-time as a Special Deputy United States Marshal for SOFAST, used a USMS-issued vehicle and tactical vest for his job duties, and reported to a USMS supervisor. *See* § 1442(a)(1); *Texas v.*

5

*Kleinhart*, 855 F.3d 305, 312 (5th Cir. 2017) (finding an Austin Police Department officer was a federal officer for removal purposes because he was specially deputized into an FBI task force and "worked full-time for the FBI…received security clearance from the federal government and used federally issued equipment to carry out his regular job duties."). Meade was also a state officer at the time of the incident because his USMS special deputy designation did not remove his power and authority as a Franklin County Deputy Sheriff. For removal purposes, Meade qualifies as a federal officer.

### B. Action Taken "Under Color of Federal Office"

Next, Defendant Meade must establish that he was acting "under color of federal office," or, in other words, under the cloak of federal authority. To do this, he must show he was acting "in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals…" §1442(a)(1). Before 2011, courts used a "causal connection" test to analyze this element. The test stated that a federal officer acted "under color of office" if there was "a causal connection between the charged conduct and asserted official authority." *Jefferson Cnty.*, 527 U.S. at 431.

In 2011, Congress enacted the Removal Clarification Act to "broaden the universe of acts that enable Federal officers to remove [suits] to Federal court." H.R. Rep. No. 112–17, pt. 1, at 6 (2011). In one amendment to §1442, Congress replaced "for any act under color of office" with "for *or relating to* any act under color of office" (emphasis added).[1] Since then, there is a circuit split in the interpretation of §1442. The Third, Fourth, Fifth, Seventh, and Eleventh Circuits have found that a federal officer is acting "under color of his office" if his acts are

---

[1] The Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2, 125 Stat. 545, 545 (codified as amended at 28 U.S.C. §§ 1442, 1446, 1447 (2012)).

"alternatively *connected* or *associated*, with acts under color of federal office."[2] The Sixth, Second, Eighth, and Ninth Circuits, however, maintain that the amendment did not expand the definition of "under color of office" and continue to apply the traditional causal connection test.[3] Following the Sixth Circuit standard in *Abernathy v. Kral*, Defendant Meade was acting "under color of office" if there was "a causal connection between the charged conduct and asserted official authority." 779 F. App'x at 307 (citing *Jefferson Cnty.*, 527 U.S. at 431). In other words,

> [i]t must appear that the prosecution of him, for whatever offense, has arisen out of the acts done by him under color of federal authority and in enforcement of federal law, and he must by direct averment exclude the possibility that it was based on acts or conduct of his not justified by his federal duty.

*Mesa*, 489 U.S. at 129 (quoting *Maryland v. Soper*, 270 U.S. 9, 33 (1926)).

Defendant Meade argues that he had federal authority to investigate and arrest Mr. Goodson because federal law provides that deputy marshals have all the powers of a state sheriff, and state sheriffs may arrest people violating state law. (ECF No. 11 at 2.) Meade also argues that USMS policy directives gave him power to make arrests for state law violations. Meade first points to USMS Policy Directive 8.9, which states that marshals and deputy marshals can make warrantless arrests for violations of federal law:

> United States Marshals and their deputies…may make arrests without warrant for any offense against the United States committed in their presence or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony.

---

[2] *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020); *Sawyer v. Foster Wheeler, L.L.C.*, 860 F.3d 249, 258 (4th Cir. 2017); *In re Commonwealth's Mot. to Appoint Counsel Against or Directed to Defender Ass'n of Phila.*, 790 F.3d 457, 470–71 (3rd Cir. 2015); *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 944 (7th Cir. 2020); *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1144 & n.8 (11th Cir. 2017).
[3] *See Veneruso v. Mount Vernon Neighborhood Health Ctr.*, 586 F. App'x 604, 607 (2d Cir. 2014); *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1230 (8th Cir. 2012); *Abernathy v. Kral*, 779 F. App'x 304, 307 (6th Cir. 2019); *Washington v. Monsanto Co.*, 738 F. App'x 554, 555 (9th Cir. 2018).

(ECF No. 11-1 at 1.)  Next, Meade cites another policy directive that allows deputy marshals to arrest people based on state law violations:

> If a deputy U.S. Marshal, who is in possession of their badge, credentials, and authorized weapon, witnesses a violation of state law which could result in death or physical injury to a person, the Deputy is authorized and has the discretion to take reasonable action as a law enforcement officer to prevent the crime or apprehend the violator.

(*Id.* at 3–4.)  Third, Meade cites 28 U.S.C. § 564, which gives U.S. marshals and deputy marshals and other officials the powers of a state sheriff:

> United States marshals, deputy marshals and such other officials of the Service as may be designated by the Director, in executing the laws of the United States within a State, may exercise the same powers which a sheriff of the State may exercise in executing the laws thereof.

28 U.S.C. § 564.  Under Ohio law, "[a] sheriff…shall arrest and detain, until a warrant can be obtained, a person found violating…a law of this state, an ordinance of a municipal corporation, or a resolution of a township."  R.C. 2935.03(A)(1).  Meade concludes that he had the power to make arrests for state violations because sheriffs have that power and § 564 gives all powers of a sheriff to deputy marshals.

Meade's argument is flawed because he was a *special* deputy marshal, not a deputy marshal or a marshal. The policy directives above only apply to marshals and deputy marshals. Special deputy marshals have more limited powers.  Although § 564 states that "other officials" may have the powers of a state sheriff as "designated by the Director," there was no such designation in this case.

Meade's federal authority as a SOFAST officer was narrowly defined. USMS Policy Directive 17 states that special deputy marshals have authority under Title 18 to perform up to five of the following federal law enforcement functions:

      a. Seek and execute arrest warrants and search warrants;

      b. Make arrests without a warrant if there are reasonable grounds to believe that the suspect has violated or is violating federal law;

      c. Serve subpoenas and other legal writs;

      d. Monitor Title III Intercepts (electronic surveillance); and

      e. Carry firearms for personal protection or the protection of those covered under the federal assault statutes.

(ECF No. 15-4 at 1.) The specific grant of authority is designated in the special deputy's Oath of Office, Authorization, and Appointment. (*Id.*)

According to the Memorandum of Understanding ("MOU") between the USMS and Franklin County Sheriff's Department and Meade's Oath of Office, he had federal authority under USMS Policy Directive Section 17.11(D)(4)(a) to "investigate and arrest, as part of join law enforcement operations, persons who have active state and federal warrants for their arrest." (Oath of Office, ECF No. 15-2; SOFAST MOU, ECF No. 15-1.) In his Oath, Meade swore to "exercise the authorities as limited by this Special Deputation solely in furtherance of the mission for which [he] [had] been specially deputized" and "only so far as necessary to faithfully complete that mission." (Oath of Office, ECF No. 15-2.) Thus, Meade only had federal authority to investigate and arrest fugitives who had active state or federal warrants for their arrest.

Mr. Goodson was not a fugitive and he did not have an active arrest warrant on December 4, 2020. Meade concedes he was not executing an arrest warrant when he pursued Goodson. Instead, Meade sought to "interview and possibly arrest Goodson for his provocative handling of his firearm in his car" in violation of Ohio laws prohibiting improper handling of a firearm in a motor vehicle and aggravated menacing. (ECF No. 7 at 6.)

SOFAST Special Deputy Ryan Rosser, who was assigned to the same missions as Meade on December 4, 2020, testified at the evidentiary hearing that their pursuit of Goodson was not

9

like other SOFAST missions. There was no SOFAST pre-mission briefing or operational plan and no direction from the USMS team leader to arrest Mr. Goodson. Every fugitive that SOFAST pursues is assigned a fugitive identification ("FID") number in the SOFAST computer system. According to Special Deputy Rosser, SOFAST special deputy marshals may not arrest a suspect without both a FID number and an active warrant, unless that person is found violating the law in the same place as a fugitive when the marshals execute an arrest warrant for the fugitive. Mr. Goodson was not a fugitive, did not have a warrant out for his arrest, did not have a FID number in the SOFAST computer system, and was not committing a crime in the same place as a warrant execution. Thus, Defendant Meade was not acting within his limited SOFAST authority when he attempted to investigate and arrest Goodson.

The cases that Defendant Meade cites are dissimilar to this case because they are either not § 1442(a) federal-officer removal cases, or the defendants are U.S. marshals and deputy marshals, not special deputy marshals. *See United States v. Jenkins*, 67 F.3d 297 (4th Cir. 1995) (finding that a deputy U.S. marshal was acting under color of office when he prevented a theft in a fast-food restaurant); *United States v. Laub Baking Co.*, 283 F. Supp. 217, 221 (N.D. Ohio 1968) (finding, in a case unrelated to §1442(a) removal, that a U.S. marshal had the same power as a sheriff to fingerprint defendants who were arrested for violations of federal antitrust laws under the Sherman Act, 15 U.S.C. § 1 *et seq*.); *United States v. Red Feather*, 392 F. Supp. 916, 919 (D.S.D. 1975) (finding, in a case unrelated to §1442(a) removal, that U.S. marshals exercising federal authority at the Wounded Knee uprising had full authority of state sheriffs under South Dakota law to "keep and preserve the peace" and to "pursue and apprehend all felons."); *United States v. Hoy*, 137 F.3d 726 (2d Cir. 1998) (finding, in an 18 U.S.C. § 111(a)(1) assault on a federal officer case, that a deputy U.S. marshal was performing his "official duty" when he was attacked

by the criminal defendant); *United States v. Colbert*, 70 F.3d 1263 (4th Cir. 1995) (finding, in an 18 U.S.C. § 111(a)(1) assault on a federal officer case, that three special deputy FBI task force officers were acting under their official authority when they were assaulted by the criminal defendant). The definition of "performance of official duties" under 18 U.S.C. § 111(a)(1) is not comparable to "under color of office" as used in § 1442(a). 18 U.S.C. § 111 is a separate statute concerning very different situations where federal officers are victims, not criminal defendants.

*Texas v. Kleinert* is a closer comparison to Meade's case but it is still distinguishable. There, Austin Police Department Officer Kleinert was specially deputized to investigate bank robberies for the FBI's local task force. *Kleinert*, 355 F.3d at 309. During one bank robbery investigation, a man came to the bank and stated that he wished to withdraw money. *Id.* A bank employee knew the man was lying about his identity and told the Kleinert. *Id.* When Kleinert approached the man to ask questions, the man ran off and Kleinert pursued him. *Id.* at 310. There was a physical confrontation and the man was shot and killed. *Id.* Kleinert was charged with homicide. He removed the case to federal court. In affirming removal, the Fifth Circuit stated:

> Kleinert satisfied the color-of-office element. In his notice of removal, Kleinert said he was a specially deputized federal agent who investigated bank robberies for the FBI's local task force. Kleinert alleged that he first encountered Jackson while investigating a bank robbery—a federal crime—and, during their interaction, developed probable cause to believe that Jackson was trying to rob or defraud the same bank—also federal crimes—culminating in the chase. According to Kleinert, federal law authorized him to arrest Jackson based on probable cause, and Kleinert engaged in the conduct that the State charged as criminal (striking Jackson, attempting to physically control Jackson, and failing to holster his gun) during the arrest.

*Id.* at 313. Unlike Meade, Kleinert's challenged conduct was shooting a man suspected of attempting a bank robbery—the very task for which he was specially deputized. Kleinert was authorized to "arrest upon probable cause of a federal crime, such as a bank robbery or bank fraud." *Id.* at 313. Meade's challenged conduct—investigating, arresting, and shooting Mr. Goodson for

11

a state law crime absent a warrant—was not within the tasks he was specially deputized to perform. Meade was specially deputized to investigate and arrest fugitives with outstanding warrants. Mr. Goodson was not a fugitive and he did not have an outstanding warrant. Additionally, Goodson was not present at the place where Meade attempted to execute a warrant. Meade saw Goodson after he was finished with his mission for the day and had left the scene of the earlier search.

Because Meade did not have federal authority to arrest Mr. Goodson as a SOFAST special deputy U.S. marshal, there is no causal connection between his shooting Mr. Goodson and his federal authority. *See Abernathy*, 779 F. App'x at 307. Meade is not entitled to removal to federal court because he was not acting under the color of federal office. *See Mesa*, 489 U.S. at 129.

Moreover, Defendant's argument that he had federal authority based on state authority is contrary to the purpose of the removal statute. "Federal officers and employees are not, merely because they are such, granted immunity from prosecution in state courts for crimes against state law." *Symes,* 286 U.S. at 518. Rather, the long-recognized purpose of federal-officer removal is the protection of federal *authority. Davis*, 100 U.S. at 263. There is no federal authority to protect here. Defendant Meade's only authority to arrest Goodson came from his state authority as a deputy sheriff to enforce state law. This case is properly tried in state court.

### IV.

For the reasons stated, Plaintiff's Motion for Summary Remand, (ECF No. 5), is **GRANTED**. The Clerk is directed to close this case.

**IT IS SO ORDERED.**

**2/17/2022**                                                     **s/Edmund A. Sargus, Jr.**
**DATE**                                                          **EDMUND A. SARGUS, JR.**
                                                                             **UNITED STATES DISTRICT JUDGE**